United States District Court
Southern District of Texas

**ENTERED**

July 15, 2016

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BEVERLY J. REEVES, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-15-2284 |
| | § | |
| CAROLYN W. COLVIN, ACTING | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER DENYING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Before the Magistrate Judge[1] in this social security appeal is Plaintiff's Motion for Summary

Judgment (Document No. 11), Defendant's Response to Plaintiff's Motion for Summary Judgment

(Document No. 13), Defendant's Motion for Summary Judgment (Document No. 10), and Plaintiff's

Response to Defendant's Motion for Summary Judgment (Document No. 14). After considering the

cross motions for summary judgment, the administrative record, and the applicable law, the

Magistrate Judge ORDERS, for the reasons set forth below, that Defendant's Motion for Summary

Judgment (Document No. 10) is GRANTED, Plaintiff's Motion for Summary Judgment (Document

No. 11) is DENIED, and the decision of the Commissioner is AFFIRMED.

---

[1] The parties consented to proceed before the undersigned Magistrate Judge on November
24, 2015. (Document No. 17).

## I. Introduction

Plaintiff, Beverly J. Reeves ("Reeves") brings this action pursuant to the Social Security Act ("Act"), 42 U.S.C. 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration ("Commissioner") denying her applications for disability insurance benefits ("DIB") and supplement security income ("SSI"). Reeves argues that substantial evidence does not support the Administrative Law Judge's ("ALJ") decision, and the ALJ, Patricia C. Henry, committed errors of law when she found that Reeves was not disabled. Reeves argues that she has been disabled since January 1, 2010. According to Reeves, the ALJ failed to follow the March 12, 2013, Order of Remand issued by the Appeals Council concerning the evaluation of Reeves's alleged mental impairments. Reeves contends that the ALJ's assessment of her mental impairment in her RFC is contrary to opinions of two consulting examinations by Dr. Whitley and Dr. Fox, the treatment records of her treating psychiatrist, Marco Renazco, M.D., and the record as a whole. Reeves seeks an order reversing the ALJ's decision, and awarding benefits, or in the alternative, remanding her claim for further consideration. The Commissioner responds that there is substantial evidence in the record to support the ALJ's decision that Reeves was not disabled, that the decision comports with applicable law, and that the decision should, therefore, be affirmed.

## II. Administrative Proceedings

On November 19, 2010, Reeves filed for DIB and SSI claiming she has been disabled since November 19, 2010. (226-236). The Social Security Administration denied her applications at the initial and reconsideration stages. (Tr. 91-94, 116-123, 127-132). Reeves then requested a hearing before an ALJ. (Tr. 133-134). The Social Security Administration granted her request, and the ALJ held a hearing on April 3, 2012. (Tr. 22-60). On April 27, 2012, the ALJ issued her decision finding

Reeves not disabled. (Tr.95-109).

Reeves sought review by the Appeals Council of the ALJ's adverse decision. (Tr. 183, 191-192). The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused her discretion; (2) the ALJ made an error of law in reaching her conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; (4) a broad policy issue may affect the public interest or (5) there is new and material evidence and the decision is contrary to the weight of all the record evidence. After considering Reeves's contentions in light of the applicable regulations and evidence, the Appeals Council, on March 12, 2013, granted Reeves's request for remand and remanded the matter for further proceedings. (Tr. 110-115). The ALJ held another hearing on January 8, 2014. (Tr. 61-90). On March 14, 2014, the ALJ issued her decision finding Reeves not disabled. (Tr. 5-21). Again, Reeves sought review by the Appeals Council of the ALJ's adverse decision. (Tr. 4). On June 17, 2015, the Appeals Council concluded that there was no basis upon which to grant Reeves's request for review. (Tr.1-3). The ALJ's findings and decision thus became final.

Reeves has timely filed her appeal of the ALJ's decision. The Commissioner has filed a Motion for Summary Judgment (Document No. 10). Likewise, Plaintiff has filed a Motion for Summary Judgment (Document No. 11). This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1 through 417. (Document No. 5). There is no dispute as to the facts contained therein.

### III. Standard for Review of Agency Decision

The court, in its review of a denial of disability benefits, is only "to [determine] (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's

decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999).

Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision as follows:

"[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial

evidence, shall be conclusive." 42 U.S.C. § 405(g). The Act specifically grants the district court the

power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the

decision of the Commissioner of Social Security with or without remanding the case for a rehearing"

when not supported by substantial evidence. *Id.* While it is incumbent upon the court to examine

the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d

1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues

de novo, nor substitute its judgment" for that of the Commissioner even if the evidence

preponderates against the Commissioner's decision. *Chaparo v. Bowen*, 815 F.2d 1008, 1009 (5th

Cir. 1987); *see also Jones* at 693; *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in

the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir.

1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to

be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305

U.S. 197, 229 (1938)). Substantial evidence is "more than a scintilla and less than a preponderance."

*Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a

suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found

only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"

*Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting *Hemphill v. Weinberger*, 483 F.2d

1127 (5th Cir. 1973)).

## IV. Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving her disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques. *Id.* § 423(d)(3). The impairment must be so severe as to limit the claimant in the following manner:

> [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

*Id.* § 423(d)(2)(A). The mere presence of an impairment is not enough to establish that one is suffering from a disability. Rather, a claimant is disabled only if she is "incapable of engaging in any substantial gainful activity." *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milan v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to determine disability status:

1. If the claimant is presently working, a finding of "not disabled" must be made;

2. If the claimant does not have a "severe" impairment or combination of impairments, she will not be found disabled;

3. If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;

5

4. If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5. If the claimant's impairment prevents her from doing any other substantial gainful activity, taking into consideration her age, education, past work experience, and residual functional capacity, she will be found disabled.

*Id.*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists. If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). Once the Commissioner demonstrates that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett*, 67 F.3d at 563.

In the instant action, the ALJ determined, in her March 14, 2014, decision that Reeves was not disabled at step five. In particular, the ALJ determined that Reeves had not engaged in substantial gainful activity since January 1, 2010 (step one); that Reeves's blindness in right eye, degenerative joint disease of fifth metatarsal, depression, anxiety, opioid dependence, and degenerative joint disease of right shoulder were severe impairments (step two); that Reeves did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in Appendix 1 of the regulations (step three); based on the record, and the testimony of Reeves, Reeves had the RFC to perform light work limited to "occasional postural maneuvers, such as kneeling, stooping, crouching, crawling, or climbing stairs or ramps; must avoid climbing on ladders, ropes, and scaffolds; limited to occasional overhead reaching with the upper right

6

extremity; limited to occupations which do not require exposure to dangerous machinery and unprotected heights; limited to occupations which require no prolonged reading due to monocular vision and resultant demands on eye with vision; and is limited to unskilled work" (Tr. 12-13). The ALJ further found that Reeves was able to perform her past relevant work as a housekeeper (step four); and that based on Reeve's RFC, age, education, work experience, and the testimony of a vocational expert, that Reeves could perform work as a garment sorter, laboratory sample carrier, and a food sorter, and that Reeves was not disabled within the meaning of the Act (step five). As a result, the Court must determine whether substantial evidence supports the ALJ's step five finding.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating, examining and consultative physicians on subsidiary questions of fact; (3) subjective evidence as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age. *Wren*, 925 F.2d at 126.

## V. Discussion

The objective medical evidence shows that Reeves has been treated for an eye condition, shoulder and foot pain, depression/anxiety, and opioid dependence.

The majority of the medical records consist of progress notes showing that Reeves had normal physical exams and had her prescriptions re-filled. *See* September 9, 2009 (Tr. 325); October 7, 2009 (Tr. 326); December 2, 2009 (Tr. 325); August 23, 2010 (Tr. 324); September 20, 2010 (Tr. 323); October 18, 2010 (Tr. 322); November 15, 2010 (Tr. 321); January 10, 2011 (Tr. 320); March 25, 2011 (Tr. 318); April 2011 (Tr. 317); and May 18, 2011 (Tr. 316).

With respect to her vision, Reeves was seen on November 8, 2010, for an evaluation.

According to the treatment note, she was found to have 20/400 and 20/30 corrected vision. Reeves was diagnosed with "amllyopia, red in the right eye and early cataracts, [] sclerosis in both eyes. All other findings were within normal limits at this time." (Tr. 306). On March 14, 2013, Reeves was evaluated at the Berkeley Eye Center by Erin A. Doe. (Tr. 381-383). She was diagnosed with chronic allergic conjunctivitis OU and superficial keratits, unspecified OU. Because of her pending benefit application, Reeves was referred for a consultative eye evaluation with David Tasker, M.D. The evaluation took place on September 26, 2013. (Tr. 365-367). Dr. Tasker opined that his evaluation was affected by Reeves's "child like temper tantrum" and "bizarre behavior." Dr. Tasker wrote: "Claimant has normal ocular motility and normal pupil responses. She has normal lids, cornea, conjunctive, AC, iris, lens OU, IOP normal OU at 10mm Hg applanation OU. Fundi shows normal disc and macula and retina OU." (Tr. 365). Dr. Tasker opined that in the right eye, Reeves has "decreased vision out of proportion to physical findings. No refraction to show refractive amblyopia. No strabismus to show cause of "amblyopia" by history" and in the left eye that she has "myopia with visual acuity poorer than eye exam would explain." (Tr. 366). As for a prognosis, Dr. Tasker opined that "no visual fields requested so amount of spatial problems with ambulation and ability to drive car not able to be established by this examination." (Tr. 366).

On February 4, 2012, Reeves was hospitalized at Methodist West Hospital in Houston, Texas, following an accidental overdose of Ambiem. (Tr. 368-380). A Ct scan of the brain revealed no significant abnormality.

Following Reeves's hospitalization she began being treated monthly by Marco A. Renazco, M.D. Her initial evaluation was on March 1, 2012. (Tr. 386-389). Dr. Renazco noted no deficits in intellectual faculties; a well organized but distractible thought process. Reeves was diagnosed

8

with opioid dependence and anxiety disorder. Dr. Renazco prescribed suboxone for the opioid dependency. Dr. Renazco assessed a GAF of 45 but noted it had been 55 for the past year. At her follow-up appointment on March 7, 2012, Dr. Renazco noted that Reeves was tolerating the medication and switched her to Klonopin. (Tr. 390). At Reeves's next appointment on April 4, 2012, Dr. Renazco described Reeves's memory problems as "subjective" and noted that she continued to complain of anxiety, headaches and low mood. Nearly a month later, on May 2, 2012, Dr. Renazco wrote that Reeves's mood was improving and her anxiety decreasing. (Tr. 392). However, on May 30, 2012, Reeves reported an increase in her stress level and insomnia due to problems with her daughter. (Tr. 393). Similarly, at her June 26, 2012, follow-up, Dr. Renazco noted Reeves problems with insomnia, anxiety and depression. Dr. Renazco prescribed Trazadone. (Tr. 394). At Reeves's follow up on July 24, 2012, Dr. Renazco noted that Reeves's mood was better and she was sleeping well. He adjusted her medications by stopping Celexa. (Tr. 395). On August 21, 2012, Reeves reported an increase in anxiety, depression and stressors. Dr. Renazco prescribed Prozac. (Tr. 396). At her next appointment on September 17, 2012, Dr. Renazco opined that Reeves's mood was stable. (Tr. 397). However, at her October 15, 2012, office visit, Reeves reported that she skips taking suboxone some days. Dr. Renazco opined that her mood was worse. (Tr. 398). The progress note from Reeves's November 7, 2012, shows she was clinically stable. (Tr. 399). On December 5, 2012, Dr. Renazco prescribed a different anti-depressant.(Tr. 400). On January 2, 2012, Reeves reported that she had not started on Wellbutrin and had not been taking Trazadone. Dr. Renazco noted she had increased anxiety, continued stressors and depressed mood. (Tr. 401). The record further shows that on January 29, 2013, Dr. Renazco wrote that Reeves's mood had improved. (Tr. 402). At her February 26, 2013, office visit, Dr. Renazco opined that

Reeves was ready for a scheduled dose drop of suboxone. (Tr. 403). On March 26, 2013, and again on April 22, 2013, Reeves reported increased anxiety, stressors and forgetfulness. (Tr. 404-405). At her follow-up office visit on May 24, 2013, Dr. Renazco diagnosed Reeves with chronic inattention. (Tr. 407). Reeves's mood and anxiety level was improved at her June 25, 2013, office visit. (Tr. 408). The mental status exams from the monthly visits were largely unchanged from her initial office visit.

The record further reflects that Reeves underwent an psychological evaluation on March 28, 2012. The evaluation was performed by Jim C. Whitley, Ed.D, a clinical psychologist. 9Tr. 332-350). Reeves described her chief complaints as "extreme memory loss, " congenital ophthalmological issues and constant headaches. (Tr. 332). The results of her mental status exam follow:

**General Appearance**
The patient was a fifty-two year old Anglo female who appeared to be much older than her stated age. She was dressed for the occasion wearing slacks, blouse and shoes. She was clean and neat in her attire and grooming habits, both of which reflected to lower SES.

**Attitude and Behavior**
The patient was cooperative and compliant. There were no signs of resistance or appositional behavior noted.

**Mood and Affect**
Her overall mood was clearly depressed. She cried on occasion and affect was dysphoric as well.

**Special Preoccupations**
The patient does not report a history of hallucination and delusions. She denied suicidal ideation and gestures and denied all type of drug or alcohol involvement. She also denied that she had ever been hospitalized in a psychiatric hospital and she denied that she had ever been raped, abused, or molested.

**Stream of Mental Activity**

The patient did not exhibit any evidence of thought disorder. There was no loosening of associations, tangential thinking and or florid thought processes.

**Sensorium and Orientation**
The patient had driven herself to the evaluation on this date. She was able to give current information about day to day living.

**Memory**
The patient knew her address, date of birth and age. She knew her social security number. She knew that for breakfast she had not eaten because she didn't have any money but for dinner the night before had spaghetti and noodles. She was able to recall two of three objects at five minutes.

**Concentration and Attention**
The patient was able to count from one to ten without error. She knew the days of the week without error and could count backwards from 20 to 0 without error. She could spell the word *world* forward but not in reverse. She did not attempt serial 3's or serial 7's, unfortunately they were incorrect.

**Abstract Ability**
With regard to the proverb *do unto others*, she stated, "Treat people how you want to be treated."

With regard to the proverb, *all that glitters is not gold*, she stated, "Just because it looks good, it does not mean it is."

**Insight and Judgment**
When the patient was asked what she would do if she found an envelope in the street that was sealed, addressed and had a new stamp, she would, "Put it in the mailbox." When she was asked what she would do if she saw smoke and fire coming from her home, the patient stated, "I would call 911." (Tr. 334-335).

Dr. Whitley administered several tests including the Leiter International Performance Score; Millon

Clinical Multi axial Inventory; and Wechsler Memory Scale-3. Based on the testing and mental

status exam, Dr. Whitley opined about Reeves's functional limitations. Dr. Whitley wrote:

**Functional Information**
Activities of Daily Living:
The patient stated that she currently lives alone in a small home that is being paid for by her son. She stated that she has trouble sleeping because "I worry about everything." She stated that frequently she does not get up, stays in bed all day and

does not make her bed.  She is able to dress herself.  She does not need help in the bathroom, although she stated that her daughter shaves her legs.  She makes simple meals, washes dishes, washes clothes, and does not watch much TV because of her blurred vision.  She does not listen to the radio.  She does not read the newspaper because she cannot see the print.

Social Functioning
The patient stated that she does not go to church.  She does not have any friends that visit.  She has a dog that she cares for.  She does not shop for groceries.  Her daughter pays her bills.

Concentration, Persistence  and Pace:
The patient's ability to concentrate appeared to be lower than her intellectual functioning.  She would get on task but was easily overwhelmed and seemed to be quick to quit.  She also complained of vision problems as well as the ability to focus. This apparently has been problematic for her most of her life including even when she was in high school, so there are some indications to suggest that the condition may be deteriorating.

**Deterioration or Decompensation**
The patient has had continued loss of functioning for most of her adult life and that persists even today.

Dr. Whitley diagnosed Reeves with major depressive disorder, severe, recurrent; somatization disorder.  With respect to Reeves's prognosis, Dr. Whitley wrote:

The functional level appears to be deteriorating; etiology for that is unknown.  The patient was encouraged to seek a Gold Card for some medical assistance but it is believed that even with medical intervention, the overall long term prognosis for this patient is very guarded.  (Tr. 338).

Eighteen months later, on October 22, 2013, Reeves underwent a second psychological evaluation with Daniel J. Fox, Ph.D.  (Tr. 352-359).  Reeves identified her chief complaints as significant depressive symptoms and problems with short term memory.  (Tr. 353).  Dr. Fox observed that Reeves was driven to the assessment by a friend but is able to drive.  She ambulated slowly due to "reported severe arthritis in her left foot."  (Tr. 352).  He also noted that Reeves "did not appear to have difficulty with initial comprehension of task instructions, although she had

difficulty maintaining knowledge of instructions for the duration of the subtest." (Tr. 352). With respect to the history of her present illness, Reeves reported that her depression began in 2009, due to impaired vision, the death of her mother, and loss of her job. She reported that she had "not been dependent on opiates since 2005, but admitted that she took pills on the Saturday prior to this evaluation." (Tr. 354). As for activities of daily living, Reeves reported that she spends most of her day in bed and is not motivated to do household chores or cook. She is able to grocery shop and manage her finances. She further stated that she deals with stress by staying in bed. As for social functioning, Reeves reported that she gets along well with others but has self isolated because she is depressed and feels that her children "ditched" her. She reported that she gets along well with individuals in positions of authority. As for completing tasks timely and appropriately, Reeves reported that she is capable of completing simple tasks but has difficulty completing complex tasks. Reeves attributed this difficulty to working memory deficits. As part of Dr. Fox's evaluation, he administered a mental status exam and several tests including the WAIS-IV and WRAT-4. Dr. Fox noted that the test results of the WAIS-IV suggest that Reeves has "cognitive deficits that would impair her ability to complete tasks that require concentration, sustained attention, memory, processing visual material, perceptual reasoning, or verbal skills. However, it is likely that her depressive symptoms and impaired vision interfered with her ability to complete tasks with full concentration and proficiency." (Tr. 357). The results of Reeves's mental status examination follow:

APPEARANCE, BEHAVIOR, AND SPEECH
Ms. Reeves presented for testing as a dysphoric woman, who was neatly and casually dressed. She appeared her stated age. Mr. Reeves walked slowly due to reported arthritis in her left foot. No abnormalities were noted in fine motor coordination. Speech was normal in rate, volume, spontaneity, and productivity. Ms. Reeves was

cooperative throughout the testing, and appeared to put forth adequate effort, although she was tearful and upset throughout testing and appeared distracted by her depressive symptoms.

THOUGHT CONTENT AND PROCESSES
There was no evidence of bizarre ideation with thought processes. She was able to interpret a proverb, but had some difficulty grasping similarities between words and concepts.

PERCEPTUAL ABNORMALITIES
Ms. Reeves denied the presence of any auditory or visual hallucinations or delusions. She did not appear to be attending to internal stimuli during testing.

MOOD AND EFFECT
Ms. Reeves's affect was dysphoric. She endorsed symptoms of depression, including sadness, fatigue, anhedonia, hopelessness, worthlessness, helplessness, difficulty sleeping, and confusion. She denied past or current suicidal and homicidal ideation or intent. She said she would never commit suicide because she would go "straight to Hell," but that she "cannot wait for her life to end."

SENSORIUM AND COGNITION
Ms. Reeves did not appear confused and was oriented to person, place, and time. She was aware of current events, and her level of intelligence appeared to be average.

MEMORY
Ms. Reeves's long-term memory appeared adequate, as she was able to recall details of her life. Her short-term memory appeared to be impaired, as she frequently asked the examiner to repeat questions. Ms. Reeves seemed to have difficulty with working memory, as she frequently requested that the examiner repeat task instructions.

CONCENTRATION
Concentration appeared inadequate.  Ms. Reeves had difficulty attending to and focusing on tasks, especially when she found tasks to be difficult, as she was sad and tearful.

JUDGMENT AND INSIGHT
Mr. Reeves appeared to have fair insight.  She was aware of the purpose of the examination, and was able to effectively communicate her symptoms to the examiner.  She stated that she would forget to take her medication without a reminder. (Tr. 355-356).

Overall, based in his clinical interview, and the testing results, Dr. Fox opined:

14

> Results across all assessments suggest difficulties in cognitive functioning,
> particularly perceptual reasoning and processing speed. However, these results
> should be interpreted with caution as Ms. Reeves has significant visual deficits. In
> addition, Ms. Reeves was dysphoric and tearful during testing, and appeared to have
> **moderate difficulty concentrating on tasks**. This is consistent with Ms. Reeves
> self-reported difficulties, including memory impairment and symptoms of depression.
> (Tr. 358).

The record further shows that Dr. Fox completed a "Medical Source Statement of Ability to do

Work-Related Activities (Mental). (Tr. 361-363). Dr. Fox opined that because of depressive

symptoms, Reeves has difficulty following directions and retaining instructions that would likely

impact complex task completion. Dr. Fox rated as "none" or "absent minimal limitations" in the

ability to understand and remember simple instructions; carry out simple instructions; the ability to

make judgments on simple work-related decisions. Dr. Fox rated Reeves as having a "Moderate" or

"more than a slight limitation in this area but the individual is still able to function satisfactorily"

in the ability to understand and remember complex instructions; carry out complex instructions; and

the ability to make judgments on complex work-related decisions. (Tr. 361).

As for the ability to interact appropriately with supervisors, co-workers, and the public, and

to respond to changes in a routine work setting, Dr. Fox identified Reeves as having "Moderate"

impairments in all areas, namely, the ability to interact appropriately with the public; interact

appropriately with supervisor(s); interact appropriately with co-workers; and respond appropriately

to usual work situations and to changes in a routine work setting. Dr. Fox based his assessment on

Reeves's depressive symptoms such as her tendency to isolate from others.

Reeves had an examination of her feet on June 6, 2013. (Tr. 384). Reeves reported that she

has had multiple surgeries on her feet and suffers from severe pain in the left great toe that makes

it difficult to walk. (Tr. 384). An x-ray of the great toe taken on June 13, 2013, revealed "1. marked

sclerosis, bony spurring and subcortical cysts in the interphalangeal joint of the great toe compatible

with an erosive arthropathy, either osteoarthritis or an inflammatory arthropathy

2. diffuse interphalangeal joint irregularity and destruction of the fifth metatarsal head as well." (Tr.

385).

      Reeves also sought medical attention at the Cypress Health Center, affiliated with the Harris

Health System on October 12, 2013. (Tr. 409-417). There, she was examined by Diana Blicharski,

M.D. Reeves was referred to physical therapy for low back pain and shoulder pain. She was also

referred to a podiatry for her toe.

      Reeves contends that the ALJ failed to follow the special technique (the psychiatric review

technique or "PRT") outlined in 20 C.F.R. §§ 404.1520a and 416.920a for evaluating mental

impairments at steps two and three of the five-step sequential process. The PRT rates the degree of

functional limitation in four broad areas: the activities of daily living; social functioning;

concentration, persistence, or pace; and episodes of decompensation. The law is clear that the ALJ

must complete PRT and append it to the decision, *or* incorporate its mode of analysis into his

findings and conclusions. The Fifth Circuit Court of Appeals has held that an ALJ's failure to

complete a PRT is a procedural error that does not require remand, provided the error has not

affected a party's substantial rights." *McGehee v. Chater*, 83 F.3d 418, 1996 WL 197435, at *3 (5th

Cir. Mar. 21, 1996)(citing *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1984). Upon this record,

Reeves's substantial rights were not affected because the ALJ incorporated the PRT's mode of

analysis in her decision. (Tr. 11-12). The ALJ referenced the consulting examinations of Dr.

Whitley and Dr. Fox. With respect to activities of daily living, the ALJ found that Reeves has mild

restriction and noted that she reported that she took care of personal needs, prepared meals, washed

dishes and clothes, took care of a dog, and manages her finances and shops in stores. As for social functioning, the ALJ found that Reeves has mild difficulties and cited to her report that she gets along well with others. As for concentration, persistence or pace, the ALJ found that Reeves has mild difficulties. She based this on Reeves being able to complete simple tasks. Finally, the ALJ noted that Reeves has experienced one to two episodes of decompensation, each of extended duration. The ALJ further considered whether the "paragraph C" criteria are satisfied but concluded there was no evidence to support that Reeves has a residual disease process that has resulted in such marginal adjustment that even a minimal increase of mental demands or change in the environment would be predicted to cause her to decompensate.

Here, substantial evidence supports the ALJ's finding that Reeves's blindness in right eye, degenerative joint disease of the fifth metatarsal, depression, anxiety, opioid dependence, and degenerative joint disease of the right shoulder were severe impairments at step two, and that such impairments at step three, individually or in combination, did not meet or equal a listed impairment.

RFC is what an individual can still do despite her limitations. It reflects the individual's maximum remaining ability to do sustained work activity in an ordinary work setting on a regular and continuing basis. SSR 96-8p, 1996 WL 374184, at *2 (SSA July 2, 1996). The responsibility for determining a claimant's RFC is with the ALJ. *see Villa v. Sullivan*, 895 F.2d 1019, 1023-24 (5th Cir. 1990). The ALJ is not required to incorporate limitations in the RFC that she did not find to be supported by the record. *See Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991). Here, the ALJ carefully considered all of the record in formulating an RFC that addressed Reeves's physical and mental impairments. The ALJ's RFC determination is consistent with Dr. Whitley's and Dr. Fox's consultative examinations, and the Mental Residual Functional Capacity Assessment completed by

17

Dr. Fox, the treatment records, and the record as a whole. The ALJ thoroughly discussed the medical evidence, and Reeves's testimony. She explained how specific record evidence supported her RFC assessment. The ALJ also discounted Reeves's subjective complaints, finding that she was not entirely credible. The ALJ articulated the reasons supporting her decision and tied the findings in her RFC assessment to the totality of the record evidence. The ALJ, taking into account Reeves's impairments, concluded that Reeves could perform light work limited to "occasional postural maneuvers, such as kneeling, stooping, crouching, crawling, or climbing stairs or ramps; must avoid climbing on ladders, ropes, and scaffolds; limited to occasional overhead reaching with the upper right extremity; limited to occupations which do not require exposure to dangerous machinery and unprotected heights; limited to occupations which require no prolonged reading due to monocular vision and resultant demands on eye with vision; and is limited to unskilled work" and gave specific reasons in support of this determination. This factor weighs in favor of the ALJ's decision.

### B. Diagnosis and Expert Opinion

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact. The law is clear that "a treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence." *Newton*, 209 F.3d at 455. The ALJ may give little or no weight to a treating source's opinion, however, if good cause is shown. *Id.* at 455-56. The Fifth Circuit in *Newton* described good cause as where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence. *Id.* at 456. "[A]bsent reliable medical evidence from a

treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)." *Id.* at 453.  The six factors that must be considered by the ALJ before giving less than controlling weight to the opinion of a treating source are:  (1) the length of treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) the support of the source's opinion afforded by the medical evidence of record; (5) the consistency of the opinion with the record as a whole; and (6) the specialization of the source.  20 C.F.R. § 404.1527(d)(2); *Newton*, 209 F.3d at 456.  An ALJ does not have to consider the six factors "where there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," and "where the ALJ weighs the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458; *Alejandro v. Barnhart*, 291 F.Supp.2d 497, 507-11 (S.D.Tex. 2003).  Further, regardless of the opinions and diagnoses of medical sources, "the ALJ has sole responsibility for determining a claimant's disability status." *Martinez*, 64 F.3d at 176.  "The ALJ's decision must stand or fall with the reasons set forth in the ALL's decision, as adopted by the Appeals Council." *Id.* at 455; *see also Cole v. Barnhart*, 288 F.3d 149, 151 (5th Cir. 2002) ("It is well-established that we may only affirm the Commissioner's decision on the grounds which he stated for doing so.").  However, perfection in administrative proceedings is not required. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

Here, the thoroughness of the ALJ's decision shows that she carefully considered the medical records and testimony, and that her determination reflects those findings accurately.  The ALJ

summarized the evidence and set forth specific reasons concerning the weight given to the opinions of the medical sources.

Reeves contends that the ALJ erred by discounting the opinion of Dr. Whitley, an examining, consulting physician, and giving greater weight to the opinion of another examining, consulting physician, Dr. Fox. She also argues the ALJ erred by not giving greater weight to the opinion of her treating psychiatrist, Dr. Renazco, whose treatment records and opinions show that Reeves suffers from extreme symptoms of anxiety. The Commissioner responds that ALJ properly weighed the medical opinions and performed an analysis of the opinion evidence. According to the Commissioner, the ALJ summarized the medical evidence and explained the weight accorded to the opinions of the medical sources.

With respect to the opinions and diagnoses of treating physicians and medical sources, the ALJ wrote:

> The claimant testified that she is 53 years old with a 12th grade education. She had been a certified nurse's aide; however, she indicated that she is not licensed. For 19 years, she had been self-employed as maintenance worker for builders. The claimant stopped in 2009 working due to a decline in the housing market, not due to the inability to perform the work. She alleges disability since January 1, 2010. She currently lives alone and is independent in living. She alleged the inability to return to work due to headaches, arthritis in the feet, and pain in the lower back, left foot, and right arm. She stated that she is blind in the right eye. However, she denied undergoing any eye treatment for the past 4 years. She denied undergoing any cataract surgery; however, she does wear glasses. She denied having any problems with the use of her arms. In reference to mental symptoms, she alleged anxiety since 2007. She indicated that she is only able to stand for up to 2 hours at one time. In reference to activities of daily living, she stated that she spend[s] most of her day in the bedroom. However, she can prepare simple meals, drive (although she currently does not own a vehicle), go for walks and walk the dog, launder clothes, shop, watch television, and spend approximately 10 minutes on a computer. She denied cleaning the home and indicated that she rarely dusts but does fill the dishwasher.

> After careful consideration of the evidence, the undersigned finds that the claimant's

medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision. The claimant has a history of anxiety and opioid dependence (Exhibit 3F). She reported to Marco A. Refiazco, M.D., on March 1, 2012 that she started using hydrocodone for back pain in 2000 (Exhibit 12F/1). She built up a tolerance for the drug. Withdrawal symptoms included diarrhea and headaches and flu like achy symptoms. Hydrocodone use was stopped in March 2012 due to her history of opioid dependence (Exhibit 12F). Nevertheless, she also reported that in 2003, she was changed from hydrocodone to suboxone. In 2011, she started vicodin. She was prescribed medications for anxiety in April 2011. (Exhibit 3F). She received emergency room treatment due to an accidental overdose of Ambien in February 2012. (Exhibit 9F). She underwent a decrease of suboxone in April 2013. (Exhibit 12F). The claimant complained of increased anxiety with stressors as of January 2013. She admitted to being non-compliant with Trazodone and Wellbutrin use. She complained of increased anxiety with stressors in March 2013. She was found to be undergoing initial withdrawal.

She was diagnosed with refractive amblyopia in the right eye and early cataracts in November 2010. Her visual acuity was 20/400 in the right eye but 20/30 in the left eye since she was twenty years old. (Exhibits 1F; 5F). While this visual impairment is severe, it does not prevent her from working. In fact, she worked at substantial gainful activity levels for years.

The claimant underwent a consultative psychological evaluation on March 28, 2012, by Jim Whitely, Ed.D. She complained of memory loss. She denied past psychiatric hospitalizations. Her overall mood was depressed. Her affect was dysphoric. She did not exhibit any evidence of a thought disorder. She was able to count from one to ten, knew the days of the week, count backwards from 20 to 0, and spell "world" forward. She scored an IQ of 84, which placed her in the low average range of intelligence. She was diagnosed with a major depressive disorder and a somatization disorder. Psychotropic medication and psychotherapy treatments were recommended. (Exhibit 5F-6F). Dr. Whitely appears to have placed his opinion on the claimant's reports more than on objective evidence. For example, the claimant requested that is she were to be awarded benefits, she would like them to be in her daughter's name. However, she did not exhibit a thought disorder, showed no deficits in memory, would count from one to ten without error, knew the days of the week, and could recall two of three objects after five minutes. Overall there were no significant deficits in functioning identified.

The claimant underwent a psychological evaluation on October 22, 2013, by Daniel Fox, Ph.D. She alleged fatigue, anhedonia, hopelessness, worthlessness, helplessness, sleep disturbance, and confusion. Upon testing, there was no evidence

of bizarre ideation in her thought process. She denied hallucinations or delusions. Her affect was dysphoric. She was oriented in all spheres. Her level of intelligence appeared to be average. Her long-term memory appeared adequate. Her short-term memory appeared impaired. She appeared to have difficulty with working memory. Concentration appeared inadequate. She was sad and tearful. Consequently, she had difficulty attending to and focusing on tasks. Her insight was fair. Intellectual testing results revealed a full scale IQ of 77, which placed her in the borderline range. Dr. Fox opined that her depressive symptoms and impaired vision interfaced with her ability to complete tasks with full concentration and proficiency. He further opined that results in cognitive testing should be interpreted with caution since she has significant visual deficits. In reference to substance use, she admitted to a prior dependence on opioids and admitted that she had consumed two pills on the Saturday prior to the evaluation. (Exhibit 7F). The functional assessment from Dr. Fox supports a mental ability to perform unskilled work. (Exhibit 7F, pages 11-13). The results of the IQ test that he administered are suspect because she scored an IQ of 84 in 2012. (Exhibit 5F). Furthermore, she has operated her own cleaning business in the past.

In March 2013, the claimant received treatment due to an eye infection. Upon examination, her right eye had counting fingers (cf) vision and her left eye had 20/40. She was prescribed medication to treat allergic conjunctivitis. (Exhibit 10F).

An x-ray of the left great toe dated June 2013 revealed marked sclerosis, bony spurring, and cysts in the interphalangeal joint and interphalangeal joint irregularity and destruction of the fifth metatarsal head. (Exhibit 11F).

The claimant complained of depressed mood in June 12/13. However, she also admitted to psychotropic medication non-compliance. Consequently, she was restarted on psycho tropic medication treatment. (Exhibit 12F, page 23).

In October 2013, she was referred to physical therapy due to complaints of pain in her right shoulder. (Exhibit 13F). The claimant testified that her doctor recommended surgery on the toe. This condition has not last twelve months and thus, does not meet the twelve month durational requirement for disability.

The claimant's reported activities are not shown to be consistent with her claim of total disability. She took care of her ill sister for 8 months until July 2013, when she passed away from colon cancer. She currently lives independently, is capable of self hygiene, prepares meals, cares for her dog, walks the dog, lauders clothes, drives, grocery shops, watches TV, spends time on the computer, handles her own finances, dusts, vacuums, fills the dishwasher and maintains appointments with medical professionals. (Testimony).

She can read the newspaper. She alleges distractibility, inability to concentrate, problems remaining on task, and difficulty following directions. However, she has not been diagnosed or takes medication for attention deficit hyperactivity disorder. (See Exhibit 11E). She alleged depression and anxiety; however, her symptoms are under control with psychotropic medication treatment. (Tr. 13-15).

Here, the ALJ explained her rationale for discounting the limitations, physical and mental, that she found not supported by the record. With respect to Reeves's problems with memory, the ALJ agreed with Dr. Whitley, Dr. Fox, and Dr. Renazco that Reeves was limited in this area and could not perform complex tasks but as noted by Dr. Fox was capable of completing simple tasks. As a result, Reeves was limited to unskilled work. The ALJ's decision shows that he gave specific reasons for not giving greater weight to the opinion of Dr. Whitley. (Tr. 14). As for Dr. Renazco's opinions, his treatment records frelate to medication re-fills and show that she responded to medication. The records are replete with Reeves's subjective complaints and her mental status exams were unremarkable.

The ALJ's decision is a fair summary and characterization of the medical records. Given the proper discounting of the opinion of Dr. Whitley concerning Reeves's mental limitations, and the medical opinions which do support the ALJ's residual functional capacity determination, upon this record, the Court concludes that the diagnosis and expert opinion factor also supports the ALJ's decision.

## C. Subjective Evidence of Pain

The next element to be weighed is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends. Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled. *Cook,* 750 F.2d

at 395.  The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423.  The statute provides that allegations of pain do not constitute conclusive evidence of disability.  There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause pain.  Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record.  42 U.S.C. § 423.  "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'"  *Selders*, 914 F.2d at 618-19 (citing *Farrell v. Bowen*, 837 F.2d 471, 480 (5th Cir. 1988)).  Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform.  *See Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994).  The Act requires this Court's findings to be deferential.  The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALL, who has had the opportunity to observe the claimant.  *Hames,* 707 F.2d at 166.

Here, Reeves testified about her health and its impact on her daily activities.  She offered no testimony or corroboration from her family or friends with respect to her complaints about her condition.  Reeves testified that she lives alone.  (Tr. 67).  According to Reeves, her son and sister support her financially.  (Tr. 67).  Reeves testified that she has arthritis in her feet and cannot stand for more than a couple of hours.  (Tr. 69).  She also stated that she has lower back pain and left foot pain as well as upper arm/shoulder pain due to years of vacuuming.  (Tr. 70).  Reeves spends most of her day, in her bedroom.  (Tr. 70-71).  As for housework, Reeves testified that she does not vacuum, periodically dusts; is able to fill a dishwasher.  (Tr. 72-73).  She also testified that she has problems with anxiety.  (Tr. 75).  She also stated she had problems in school retaining information.

24

(Tr. 75-76). Reeves reported that her vision had gotten worse. (Tr. 77). She is blind in her right eye and uses a magnifying glass. (Tr. 78-79). She spends her time reading and watching television. (Tr. 78-79). She further reported that she cannot lift her arm and has headaches. (Tr. 80-83).

Reeves also completed a Function Report. (Tr. 276-283). Reeves stated she says home due to vision changes. (Tr. 277). She wrote that she is able to walk, feed her dog and needs no reminders to take care of grooming and personal needs. (Tr. 277-278). She indicated that she is able to prepare simple meals. (Tr. 278). Reeves wrote that other than laundry, she does no housework. (Tr. 278-279). Reeves is able to walk and drive. She is able to shop for groceries. (Tr. 279). Her hobbies include watching television, reading, and email. She also spends time with others on the telephone (Tr. 280). Reeves indicated that she is able to walk around the block but then rests a few minutes. (Tr. 281). She estimated that she can pay attention long enough to follow a movie. (Tr. 281). She is able to follow spoken instructions and if too complicated, writes them down. (Tr. 281). Reeves wrote that she handles stress "pretty well" but does not like changes to a routine. (Tr. 282). She gets along with authority figures. (Tr. 282).

The ALJ rejected Reeves's testimony as not fully credible. The undersigned finds that there is nothing in the record to suggest that the ALJ made improper credibility findings, or that she weighed the testimony improperly. Accordingly, this factor also supports the ALJ's decision.

### D. Education, Work History, and Age

The final element to be weighed is the claimant's educational background, work history and present age. A claimant will be determined to be under disability only if the claimant's physical or mental impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education and work experience, engage in any other kind of substantial

gainful work which exists in the national economy.  42 U.S.C. § 423(d)(2)(A).

The record shows that the ALJ questioned Laurie McQuade, a vocational expert ("VE"), at the hearing.  "A vocational expert is called to testify because of his familiarity with job requirements and working conditions.  'The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)).  It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).  A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record.  Beyond the hypothetical question posed by the ALJ, the ALJ must give the claimant the "opportunity to correct deficiencies in the ALJ's hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)." *Bowling*, 36 F.3d at 436.

The ALJ posed the following hypothetical questions to the VE:

Q.  Okay.  Assume a hypothetical individual with this claimant's age, education, training, and work experience who is limited to a light range of work, is limited to occasional postural maneuvers such as kneeling, stooping, crouching, crawling, or climbing stairs or ramps; must avoid climbing on ladders, ropes, and scaffolds.  Is limited to occasional overhead reaching with the upper right extremity.  Is limited to occupations which do not require exposure to dangerous machinery and unprotected heights.  Is limited to occupations which require no prolonged reading due to monocular vision and the result and demands on the eye–on the eye with vision, and is limited to unskilled work. Would such hypothetical individual be able to perform any of the jobs that this claimant has performed in the past 15 years?

A.  No.  (Tr. 85)

*                              *

26

Q. Now, if in addition, an individual was limited to occasional interaction with supervisors, co-workers, and members of the general public would that eliminate any of those jobs or change or reduce the numbers?

A. I don't believe so.

Q. If an individual was limited to sedentary work; occasional postural maneuvers; must avoid climbing on ladders, ropes, and scaffolds; limited to unskilled work. Would there be jobs in the local and national economy?

A. Yes.  semiconductor bonder; ticket counter; escort vehicle driver

Q. Now, if, in addition, an individual was limited to occasional interaction with supervisors, co-workers, and members of the general public.  Would any of these jobs be eliminated or the numbers reduced?

A. No.

*                            *

Q. In other words, if an individual was able to perform a job, say one of the jobs that you provided, but consistently exceeded any of these limits for any reason, perhaps they couldn't stay focused on the task at hand, they needed too many breaks, whatever.  That would eliminate the jobs in the competitive marketplace as well as the jobs that you provided?

A. Yes.  (Tr. 87)

Reeves's counsel had no questions for the VE.

Here, the ALJ relied on a comprehensive hypothetical question to the vocational expert.  A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record.  Upon this record, there is an accurate and logical bridge from the evidence to the ALJ's conclusion that Reeves was not disabled.  Based on the testimony of the vocational expert and the medical records, substantial evidence supports the ALJ's finding that Reeves could perform  work as a garment sorter, laboratory sample carrier, and food sorter.  The Court concludes that the ALJ's reliance on the vocational testimony was proper, and that the vocational expert's testimony, along with the medical evidence, constitutes substantial evidence

to support the ALJ's conclusion that Reeves was not disabled within the meaning of the Act and therefore was not entitled to benefits.  Further, it is clear from the record that the proper legal standards were used to evaluate the evidence presented.  Accordingly, this factor also weighs in favor of the ALJ's decision.

## V. Conclusion

Considering the record as a whole, the Court is of the opinion that the ALJ and the Commissioner properly used the guidelines propounded by the Social Security Administration, which direct a finding that Reeves was not disabled within the meaning of the Act, that substantial evidence supports the ALL's decision, and that the Commissioner's decision should be affirmed. As such, it is

ORDERED Plaintiff's Motion for Summary Judgment (Document No. 11), is  DENIED, Defendant's Motion for Summary Judgment (Document No. 10) is GRANTED, and the decision of the Commissioner of Social Security is AFFIRMED.

Signed at Houston, Texas, this 14th day of _____ July _____, 2016

FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE

28